519 So.2d 163 (1987)
David HENDRICKS
v.
CHARITY HOSPITAL OF NEW ORLEANS, et al.
No. CA-7762.
Court of Appeal of Louisiana, Fourth Circuit.
December 30, 1987.
*164 Robert J. Bruno, Bruno & Bruno, New Orleans, for plaintiff/appellee.
Arthur J. Lentini, Hall, Lentini, Mouledoux & Wimberly, Metairie, and Kathy Lee Torregano, Deputy City Atty., New Orleans, for defendants/appellants.
Before SCHOTT, BARRY and BYRNES, JJ.
SCHOTT, Judge.
This is a suit for damages resulting from an overdose of a drug prescribed by Dr. Amaraneni, a physician on the staff of Charity Hospital, and filled by Leora Gonzales, a pharmacist at Sickles Pharmacy. Defendants are the State of Louisiana through its Department of Health and Human Resources, and the City of New Orleans, which operated the pharmacy. From a judgment in favor of plaintiff against the State alone, it has appealed. The issues are whether the trial judge committed manifest error in finding no fault on the part of the pharmacist and no contributory negligence by plaintiff, and whether the judge abused his discretion by making an excessive award.
On January 13, 1984 plaintiff sought medical treatment at Charity Hospital for injuries he sustained when he fell down after passing out. Dr. Amaraneni, who treated him, learned he had a history of epilepsy and prescribed Dilantin, a drug regularly prescribed for that condition. The prescription mistakenly called for 500 mg every eight hours, but the doctor intended to prescribe 500 mg daily. Plaintiff took the prescription slip to Sickles Pharmacy where Ms. Gonzales was the pharmacist. She immediately recognized that the prescription called for an excessive dosage and sent plaintiff back to Amaraneni to *165 check it. According to plaintiff, Gonzales told him it was "enough to kill a horse."
When he returned to Amaraneni, plaintiff did not have the prescription slip, but the doctor checked the hospital chart where he had written 500 mg daily. He told plaintiff the prescription was correct, but to have the pharmacist call him if there was any question. The doctor gave plaintiff a slip on which he had written his name and three telephone numbers where he might be reached. When plaintiff returned to the pharmacy, Gonzales tried without success to reach Amaraneni by phone and left a message for him to call her. Because by now plaintiff had become impatient and because he told her Amaraneni said the prescription as written was correct, she filled the prescription putting on the label; "Take 5 capsules every 8 hours. Note: Patient should consult Physician about dosage." Sometime later, Gonzales learned from the hospital that the prescription should have called for five capsules daily.
Plaintiff immediately returned home and started taking the medicine as erroneously prescribed. Within two days he became seriously ill and again sought treatment at Charity Hospital where he was treated for Dilantin toxicity.
The trial judge gave the following reasons for judgment on liability:
Dr. Amaraneni made a mistake in writing the prescription which called for five times the intended dosage of dilantin. The pharmacist tried to call the apparent error to the attention of hospital personnel but was unsuccessful. She repeated her concern on the label of the bottle. She could be expected to do no more, and the action against the City will be dismissed.
In its first assignment, the state contends that the trial court erred in failing to find contributing fault on the part of the City through Gonzales. This contention is based on the argument that Gonzales should not have dispensed the drug until the question of the proper dosage was cleared up, she should have provided plaintiff with a copy of the prescription when she sent him back to Amaraneni, and she should have transcribed the proper dosage after she learned from the hospital that the intended dosage was 500 mg daily. The resolution of this issue depends largely on the interpretation of the testimony of the witnesses.
Plaintiff indicated that Amaraneni was annoyed and irritated when he was questioned about the prescription; that he quickly checked the chart and promptly sent plaintiff back to the pharmacy with nothing more than a message to the pharmacist to call him and a prescription slip with his name and telephone numbers. Gonzales testified that doctors typically resent questioning by pharmacists and she thought it possible that Amaraneni had prescribed the large dosage for initial use with oral instructions to plaintiff to cut down on the dosage. She was told by plaintiff that Amaraneni said the dosage was correct and she could not be charged with the knowledge that the chart showed a different dosage than the slip. In any event, she warned plaintiff to contact the doctor about the dosage in the note she placed on the bottle. Amaraneni's testimony portrayed himself as much more patient and solicitous than plaintiff's did. The trial judge's acceptance of plaintiff's version lends support to his conclusion that Gonzales did everything required of her.
On the other hand, Gonzales was quite vague in her testimony concerning how soon after plaintiff left with the drugs she found out that the correct dosage was 500 mg daily. At first she seemed to say that she spoke to the hospital only a short while after plaintiff left. Asked if she called plaintiff about the change in the prescription, she replied: "I don't know. I didn't call him. I wouldn't have known how." Standing alone, this testimony might support the inference that Gonzales breached a duty to take some reasonable steps to locate plaintiff and warn him of the dangerous position he was in. However, later in her testimony she made the following statement concerning her contacts with the hospital:

*166 A. I called and whoever it was answered the phonethey might have said such and such a division or what have you but I asked to speak to Dr. Kumar and they told me that he would return my call. Well, thinking that it would be, you know, shortly as soon as he finished with a patient, but it was hours and well, you know, I don't know when anyone did call to give me a message. It could have been after closing time or it could have been the next Monday or Tuesday.
She explained that there was some urgency about filling the prescription. She knew Dilantin was prescribed for epilepsy and thought it was important for plaintiff to start his medication right away. After she first called and left word with the hospital she didn't expect to hear right back from Amaraneni and did not want plaintiff to delay taking the medicine throughout the weekend. These considerations prompted her to fill the prescription, but to place plaintiff on notice that he should check the dosage with the doctor.
When all this testimony is considered, we cannot conclude that the trial judge committed manifest error in finding that Gonzales did not breach her duty to plaintiff. This was a close fact call, but one best made by the trial court. On the question of plaintiff's fault, the trial court's acceptance of his testimony that he was quickly assured that the prescription was correct and brushed off by a somewhat rude and irritated Dr. Amaraneni supports the result. After being shuffled back and fourth between the doctor and the pharmacist, he became justifiably angry and demanded his prescription drug so that he could begin the treatment he needed. His good faith belief that he had the right prescription was dramatically demonstrated by his conduct in staying with friends for the weekend who would see to it that he took his medicine as prescribed. To charge this plaintiff with fault would place on him an unreasonable duty. Having found no error in the trial court's findings on liability we turn to the state's assignments relative to damages. In his reasons for judgment the trial judge said:
This is a difficult case to value. Though he reserved some doubt, Dr. Sorum believed that more likely than not plaintiff's problems were psychological rather than organic. But this incident had organized plaintiff's emotional problems into a new set of symptoms rendering plaintiff dysfunctional, and will take considerably more treatment to resolve. My estimate of plaintiff's general damages is $100,000.00.
His loss of income capacity due to this incident is estimated at $25,000.00. I refer to the loss as one of capacity because given his sporadic work experience, it is difficult to quantify the loss as one of income. But he was deprived of his option to earn a regular income had he so desired and this loss is compensible. See Folse v. Fakouri, 371 So.2d 1120 [ (La.1979) ]. I estimate his disability at two and a half years to date, with two years in the future, at the minimum wage, or about $30,000.00.
His medical expenses to date total $13,611.24 I estimate his future medical at $200.00 per week for one year, and $100.00 per week for an additional year, or a total future medical of $15,000.00.
The state contends that the trial court erred in finding that these damages were caused by the overdose when plaintiff had prexisting problems and was involved in two other accidents which could have caused some of the damages claimed in this case. The record establishes that plaintiff had back trouble as a result of an accident on a ferry boat in April, 1983 and that he suffered additional injury in a bicycle accident in May, 1984. Based upon pleadings filed and depositions taken in law suits involving these accidents he seemed to be claiming the same damages he seeks in the instant case. Furthermore, he was having mental problems prior to the Dilantin overdose. On the other hand, the law is settled that a tortfeasor takes the victim as he finds him and is laible for an aggravation of the victim's pre-existing condition. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
Dr. William Sorum, a psychiatrist, testified that he began treating plaintiff in *167 May, 1985 and initially found him to be anxious and confused. As time passed he became extremely agitated, he harbored widespread phobic fears, he had mood swings, he was greatly depressed and he had a tendency toward violence. Dr. Sorum diagnosed him as a paranoid schzophrenic with suicidal and homicidal tendencies and he attributed these serious problems to the overdose.
Dr. Earl E. Aldinger, a pharmacologist and toxicolgist, described plaintiff's overdose as "horrendous" and "very, very, toxic." He stated that the dermatitis or skin rash plaintiff developed was a typical result of an overdose of Dilantin and testified that an overdose of any chemical drug that acts on the central nervous system could have lasting effects and that many of plaintiff's emotional problems resulted from the trauma of the overdose.
Lay testimony from friends and acquaintances of plaintiff, likewise supports the conclusion that whatever problems plaintiff may have had prior to the overdose were significantly and substantially aggravated by it.
In addition to the argument disputing the trial court's conclusion that the overdose caused most of plaintiff's present problem, the state also contends that the general damage award of $100,000 is excessive. Based upon the testimony already referred to plaintiff was entitled to a substantial amount for aggravation of his mental condition. But also supporting the award and unmentioned by the trial court was the severe skin rash or dermatitis which plaintiff suffered from the overdose.
Shortly after the overdose, small inflammations on the skin, like pimples, began to appear all over plaintiff's body and inside his mouth. They gradually took the appearance of blisters and sores with scabs and lasted for several months. Plaintiff was hospitalized for treatment of this condition. Photographs in evidence graphically demonstrate the serious cosmetic effect of this skin condition. Even a person of normal mentality would suffer extreme mental anguish from such a condition, but, for one whose mental condition was as fragile as plaintiff's, this condition was catastrophic.
From our review of the record we are not persuaded that the trial judge abused his discretion in his award for general damages.
The state's remaining assignment of error, that the award of $30,000 for loss of earning capacity and wages is excessive, must likewise constitute an abuse of discretion to warrant a reduction by this court. Folse v. Fakouri, 371 So.2d 1120 (La.1979). The record supports the comments made by the trial judge in his reasons for judgment. Clearly, plaintiff's mental problems resulting from the accident detract from his ability to earn a living and supplied a factual basis for the award. As pointed out in the Folse case, such a loss cannot be mathematically calculated and must be assessed within the sound discretion of the trial court. We are not convinced that there was an abuse of that discretion in this aspect of the judgment.
Accordingly, the judgment appealed from is affirmed.
AFFIRMED.